1
2
3
4
5

6                    **UNITED STATES DISTRICT COURT**

7                    **EASTERN DISTRICT OF CALIFORNIA**

8

9   STARTOP SPV – LONG ANGLE              Case No. 1:24-cv-00272-JLT-BAM
    INVESTMENTS LLC,
10                                         ORDER GRANTING DEFENDANTS'
                         Plaintiff,        MOTION TO DISMISS WITH LEAVE TO
11            v.                           AMEND

12  STARTOP INVESTMENTS, LLC, et al.,      (Doc. 22, 54)

13                       Defendants.

14

15          StarTop SPV – Long Angle Investments LLC ("Long Angle") is a Delaware limited

16  liability company with its principal place of business located in Dallas, Texas.  It brings this

17  action against Startop Investments ("Startop"), Andrew Adler, David Hardcastle, as well as many

18  individuals and entities related to Adler and Hardcastle, alleging violations of various federal and

19  state laws in connection with a loan that was made to Bitwise.  Pending before this Court is

20  Defendants' Motions to Dismiss.  (Doc. 22)  For the reasons set forth below, the Court **GRANTS**

21  the motion with leave to amend.

22                         **I.      INTRODUCTION**

23     **A. Background**

24          Bitwise, a company co-founded by Jake Soberal and Irma Olguin, Jr., "marketed itself as

25  a technological hub in underprivileged communities, focused on connecting marginalized people

26  within those communities to the broader technology industry and job market through

27  apprenticeships and related training."  (Doc. 13 at ¶¶ 16–17.) In 2022, Bitwise had $139,500,000

28  in projected revenue, and its investors included some of Wall Street's biggest names, such as JP

                                    1

Morgan Chase, Goldman Sachs, and Bank of America. (*Id*. at ¶ 18.) "The company enjoyed numerous accolades including recognition and ranking in Inc. 5000's Fastest Growing Companies, Great Places to Work, Fortune, and People Magazine." (*Id*.) "On the surface, Bitwise was a flourishing, innovative, and value-driven organization." (*Id*.) "Plaintiff alleges[] . . . that despite outward appearances, Bitwise was running on fumes and being propped up by a series of hustles and deceits by Soberal and Olguin" and "that Soberal and Olguin constantly borrowed money to keep the company afloat." (*Id*. at ¶¶ 24–25.)

Plaintiff alleges that, "unlike other investors and business partners who Bitwise defrauded," Defendants[1] "were aware of Bitwise's dire financial straits at all relevant times[;]" yet, they, as well as many of their corporate alter egos, including Startup, continued to loan millions of dollars to Bitwise. (Doc. 13 at ¶¶ 25–33.) According to Plaintiff, this was because Defendants knew that "Soberal and Bitwise were easy targets to profit from by way of loan fees and interest due to their constant need for cash." (*Id*. at ¶ 26.)

Around the first quarter of 2023, Bitwise approached Defendants regarding the possibility of providing another loan to Bitwise. (Doc. 13 at ¶ 34.) Plaintiff alleges that "Defendants were fully aware of and ready to profit from Bitwise's precarious financial position at the time," and that "Defendants [were] seeking loan participants to offload its own risk for the Loan." (*Id*. at ¶¶ 34, 36.)

Startup "invited Plaintiff to participate in the Loan by sending it a Loan Summary in the first quarter of 2023." (Doc. 13 at ¶ 36.) According to Plaintiff, "Defendants represented to Plaintiff that Bitwise would use Loan funds to improve its properties in other cities in order to replicate its ostensible success in Fresno and Bakersfield." (*Id*. at ¶ 37.) Plaintiff alleges that "Defendants knew or should have known that Bitwise would not be using the funds for that purpose." (*Id*. at ¶ 38.)

Defendants also represented to Plaintiff that the interest rate for the underlying Loan was

---

[1] For purposes of Part I, "Defendants" refers to Startop, Adler, Hardcastle, Voyager, 2112, and Premier, per the FAC. (Doc. 13 at ¶ 10.) For Part II and thereafter, "Defendants" only refers to Startop, Adler, and Hardcastle, unless otherwise specified, because they are the Defendants that filed the motion addressed in Parts II and III.

1  24% per annum, even though the actual interest was 60% per annum.  (Doc. 13 at ¶¶ 39–41.)[2]

2  Plaintiff alleges that Defendants forged signatures and documents to carry out this deception.  (*Id.*

3  at ¶ 42.)  Unaware of Defendants' deception, Plaintiff entered into a Master Participation

4  Agreement ("MPA" or "Participation Agreement") with Startop, which laid out the terms of

5  Plaintiff's participation and Startop's duties regarding the Loan.  (*Id.* at ¶ 45.)  Namely, Plaintiff

6  would receive a 50% stake in the underlying Loan to Bitwise, which is secured by multiple real

7  properties owned by Bitwise, and Plaintiff would be entitled to monthly interest payments at an

8  annual interest rate of 24% for 12 months.  (Doc. 24-1 at 2–3, 9.)  Defendants purportedly

9  represented to Plaintiff that Bitwise had never been in default, which Defendants allegedly knew

10  to be incorrect four days prior to the effective date of the MPA.  (Doc. 13 at ¶ 47.)

11  **B.  Procedural History**

12  Plaintiff filed this instant action on March 4, 2024.  (Doc. 1.)  On April 22, 2024, Plaintiff

13  filed its First Amended Complaint ("FAC"), which contains one federal securities claim and eight

14  state law claims.  (Doc. 13 at ¶¶ 61–126.)

15  Defendants Startop, Adler, and Hardcastle moved to dismiss the FAC, (Doc. 22), arguing,

16  among other things, that this Court should dismiss the sole federal claim for failure to state a

17  claim and decline to exercise supplemental jurisdiction over the remaining state law claims, (Doc.

18  23).[3]  The matter is fully briefed and ripe for review.  (Pl.'s Opp'n, Doc. 34; Defs.' Reply, Doc.

19  42; Pl.'s Sur-Reply, Doc. 43.)[4]  As indicated, (Doc. 32), the Court took the matter under

20  submission without oral argument.

21  **II.    LEGAL STANDARD**

22  Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move

23

24  _____

[2] Defendant Adler, in particular, represented to Plaintiff that Startop "was [not] making any 'spread' on the interest rate charged to participants and the interest rate charged to Bitwise."  (Doc. 13 at ¶ 40.)

25

26  [3] Defendant Bo Keuleers, as Trustee of the 29 Mallard Trust, separately moved to dismiss the sixth and seventh causes of action for lack of personal jurisdiction.  (Doc. 54.)

27  [4] The Court incorporates by reference several exhibits that are central to Plaintiffs' causes of action, including but limited to the Master Participation Agreement.  (Doc. 24-1.)  Under *Khoja v. Orexigen Therapeutics, Inc.*, this Court

28  "may assume [an incorporated document's] contents are true."  899 F.3d 988, 1003 (9th Cir. 2018) (quoting *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (alteration in original).

1  to dismiss a claim for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P.

2  12(b)(6).  To survive a motion to dismiss, the complaint "must contain sufficient factual matter,

3  accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556

4  U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

5       This plausibility inquiry is a "context-specific task that requires [this Court] to draw on its

6  judicial experience and common sense," *Iqbal*, 556 U.S. at 679, and "'draw all reasonable

7  inferences in favor of the nonmoving party[,]'" *Boquist v. Courtney*, 32 F.4th 764, 773 (9th Cir.

8  2022) (quoting *Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945

9  (9th Cir. 2014)).  "Conclusory allegations and unreasonable inferences," however, "do not

10  provide [] a basis" for determining a plaintiff has plausibly stated a claim for relief.  *Coronavirus*

11  *Reporter v. Apple, Inc.*, 85 F.4th 948, 954 (9th Cir. 2023) (citation omitted).

## III.    THE FIRST CAUSE OF ACTION

### A.  Legal Background

14       Plaintiff alleges under its first cause of action that "Defendants made . . . untrue or

15  misleading statements of material facts and omitted material facts" in connection with the MPA,

16  which Plaintiff claims violated Section 10(b) of the Securities and Exchange Act of 1934.  (Doc.

17  13 at ¶ 62.)  Section 10(b), codified as 15 U.S.C. § 78j(b), "prohibits a party from engaging in

18  'manipulative or deceptive practices in connection with the purchase or sale of a security.'"  *Espy*

19  *v. J2 Glob., Inc.*, 99 F.4th 527, 535 (9th Cir. 2024) (quoting *In re Facebook, Inc. Sec. Litig.*, 87

20  F.4th 934, 947 (9th Cir. 2023)).  Plaintiff also mentions 17 C.F.R. § 240.10b-5(b), which is co-

21  extensive with Section 10(b).  *Id.* (citation omitted).  That regulation prohibits anyone from

22  making, in connection with the purchase or sale of a security, "'any untrue statement of a material

23  fact' or omitting material facts 'necessary in order to make the statements made, in the light of the

24  circumstances under which they were made, not misleading.'"  *Id.* (quoting *Glazer Cap. Mgmt.,*

25  *L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 764 (9th Cir. 2023)).

26       "In a typical § 10(b) private action" based on material misrepresentations or omissions, a

27  plaintiff must plead and prove the following elements: "(1) a material misrepresentation or

28  omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or

4

1  omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or

2  omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci.-*

3  *Atlanta*, 552 U.S. 148, 157 (2008) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42

4  (2005)).

5          The primary dispute here is whether the underlying loan (i.e., the $5,000,000 "Loan" to

6  Bitwise) or the subsequent loan participation agreement (i.e., the "MPA") falls within the

7  meaning of "security." (*See* Doc. 34 at 8–14; Doc. 42 at 5–8.)  Both Plaintiff and Defendants

8  have extensively discussed the *Reves* test and the *Howey-Forman* test for evaluating whether an

9  instrument is a note or investment contract, respectively.[5]  (*See* Doc. 23 at 13–14 (noting that the

10 Ninth Circuit has previously held that a loan participation agreement is not a "security" under the

11 *Reves* and *Howey* tests); Doc. 34 at 8–14 (discussing the *Howey* and *Reves* tests).)

12         The Ninth Circuit's opinion in *First Citizens Fed. Sav. & Loan Ass'n v. Worthen Bank &*

13 *Tr. Co.*, 919 F.2d 510 (9th Cir. 1990), provides a helpful starting point.  Much like the instant

14 action, that case involved a situation where the plaintiff purchased a portion of (i.e., a

15 participation interest in) a single loan rather than a pool of loans.  *Id*. at 512.  The Court explained

16 that the "loan participation agreement may be a security [(1)] if the note underlying the loan

17 participation is a security or [(2)] if the loan participation agreement itself is a security."  *Id*. at

18 515.  The Ninth Circuit then proceeded to consider the first question through the lens of the *Reves*

19 test for notes, and the second question through the lens of *Howey-Forman* test for investment

20 contracts.  *Id*. at 515–16.  This is the appropriate approach here as well.

21    **B. The *Reves* Test**

22         The fundamental purpose of federal securities laws is to protect investors who may not

23 have access to the information necessary to gauge the value of a particular investment (or the risk

24 associated with it) from being defrauded by unscrupulous sellers who exploit their informational

25 advantage.  *See Randall v. Loftsgaarden*, 478 U.S. 647, 659 (1986).  Considering this purpose,

26

27 [5] The Securities Act provides a laundry list of things that could be viewed as a "security," among which are "notes"
   and "investment contracts."  15 U.S.C. § 78c(a)(10).  The *Reves* test determines whether an instrument is a note, and

28 the *Howey-Forman* test determines whether an instrument is an investment contract.  So long as an instrument is a
   "security" under any one of the tests, then it's a "security" within the meaning of a § 10(b) action.

the Supreme Court has established four factors to determine whether a "note" is a "security." They are: (1) "the motivations that would prompt a reasonable seller and buyer to enter into" the transaction—that is, whether the transaction has a "commercial" or "investment" purpose; (2) "the 'plan of distribution' of the instrument"—that is, "whether it is an instrument in which there is 'common trading for speculation or investments'"; (3) "the reasonable expectations of the investing public"; and (4) whether "the existence of another regulatory scheme" makes "application of the Securities Act unnecessary." *Reves v. Ernst & Young*, 494 U.S. 56, 66–67 (1990).

After considering the four factors, individually, the Court must first balance the four factors and then "compare the note at issue to an existing 'judicially crafted' list of instruments that are not securities. If 'the note bears a strong resemblance' to one of the instruments on that list, then . . . the note is not a security." *Kirschner v. JP Morgan Chase Bank, N.A.*, 79 F.4th 290, 304–05 (2d Cir. 2023) (footnotes omitted), *cert. denied sub nom. Kirschner v. JPMorgan Chase Bank, N.A.*, 144 S. Ct. 818 (2024). "Moreover, even if the note does not bear resemblance to any note among the list of non-security notes, a court should continue its analysis and examine four factors that make it more or less likely that a given note was issued as an investment, rather than in a consumer or commercial context." *Piaubert v. Sefrioui*, 208 F.3d 221 (9th Cir. 2000).

1. The First *Reves* Factor

The first *Reves* factor requires this Court to "examine the transaction to assess the motivations that would prompt a reasonable seller and buyer to enter into it." *Reves*, 494 U.S. at 66. "The inquiry is whether the motivations are investment (suggesting a security) or commercial or consumer (suggesting a non-security)." *Pollack v. Laidlaw Holdings, Inc.*, 27 F.3d 808, 812 (2d Cir. 1994). A lender's "motivation is investment if it expects to profit from its investment, including through earning either variable or fixed-rate interest." *Kirschner*, 79 F.4th at 305 (footnote omitted). A borrower's motivation is investment if its "purpose is to raise money for the general use of a business enterprise or to finance substantial investments." *Reves*, 494 U.S. at 66. A borrower's motivation is commercial "[i]f the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to

6

1    advance some other commercial or consumer purpose." *Reves*, 494 U.S. at 66.  As Defendants

2    correctly recognize, "a *commercial* loan made to '*finance current operations* of a borrower' or a

3    *construction project* 'does not constitute a security under federal . . . law.'" (Doc. 23 at 13

4    (quoting *First Citizens*, 919 F.2d at 515–16) (some quotation marks omitted) (emphases added).)

5         Here, the motivation of the borrower was commercial.  For one, the FAC expressly states

6    that the co-founders and co-CEOs of Bitwise, Soberal and Olguin, "constantly borrowed money

7    to keep the company afloat," (Doc. 13 at ¶ 25), which suggests that Bitwise was motivated by a

8    desire to resolve its "cash-flow difficulties" and fund current operations rather than a desire to

9    make capital investments, *see Reves*, 494 U.S. at 66.[6]  For another, the FAC and the MPA

10   expressly state that the underlying loan to Bitwise was "a commercial bridge loan."  (Doc. 13 at

11   ¶ 15; Doc. 24-1 at 2.)  The use of the word "commercial" weighs against a finding that the parties

12   to the transaction were motivated by an "investment (suggesting a security)" purpose rather than

13   "commercial or consumer (suggesting a non-security)[]" purpose.  *Pollack*, 27 F.3d at 812.

14        The motivation of the original lender, Startop, was not "investment" either.  The FAC

15   states that Adler's and Hardcastle's "main objective was securing their own profit by way of loan

16   fees and interest, *not producing any legitimate return on investment* for their companies."  (Doc.

17   13 at ¶ 57 (emphasis added).)  Plaintiff's arguments to the contrary in its brief in opposition,

18   unsupported by citations to the FAC, are not entitled to the presumption of truth on a motion to

19   dismiss.  (*See* Doc. 34 at 12–13 ("Defendants' supposed purpose in inducing Plaintiff to join the

20   master Participation Agreement was to invest in Bitwise, a business enterprise[.] . . .").)  Finally,

21   this Court considers Plaintiff's motivation.  Plaintiff asserts that its own "motivation was to

22   receive interest and the eventual return of its principal, . . . a profit-driven motivation that does

23   not resemble a commercial transaction."  (Doc. 34 at 13.)

24        In sum, even assuming that Plaintiff's motivation was investment, both Bitwise (the

25   original borrower) and Startop (the Lead lender) were principally driven by a commercial motive.

26   Given the parties' "motivations are mixed, [the first *Reves*] factor does not weigh heavily in either

27

28   ───────────────
     [6] Plaintiff alleges that "Defendants represented to Plaintiff that Bitwise would use Loan funds to improve its
     properties in other cities."  (Doc. 13 at ¶ 37; *see also* Doc. 34 at 12–13.)  To the contrary, the FAC states that Bitwise
     "borrowed money to keep the company afloat."  (Doc. 13 at ¶ 25.)

1  direction." *Kirschner as Tr. of Millennium Lender Claim Tr. v. JPMorgan Chase Bank, N.A.*, No.

2  17 CIV. 6334 (PGG), 2020 WL 2614765, at *8 (S.D.N.Y. May 22, 2020), *aff'd sub nom.*

3  *Kirschner.*, 79 F.4th 290.

4         2.  The Second *Reves* Factor

5        The second *Reves* factor considers "the plan of distribution" for the instrument, including

6  whether it is subject to "common trading for speculation or investment." *Reves*, 494 U.S. at 66.

7  This factor weighs in favor of a finding that a note is a security if the instrument was "offered

8  *and* sold to a broad segment of the public," *Reves*, 494 U.S. at 68 (emphasis added), but against a

9  finding of security if there were limitations in place that prevented the instrument "from being

10  sold to the general public," *Banco Espanol de Credito v. Sec. Pac. Nat. Bank*, 973 F.2d 51, 55 (2d

11  Cir. 1992).

12        As Defendants point out, (Doc. 42 at 6), *Kirschner* involved loan syndication to "only a

13  few hundred Parent and Child Investors," and the Southern District of New York "conclude[d]

14  that the plan of distribution [t]here [wa]s relatively narrow." *Kirschner as Tr. of Millennium*

15  *Lender Claim Tr. v. JPMorgan Chase Bank, N.A.*, No. 17 CIV. 6334 (PGG), 2020 WL 2614765,

16  at *8 (S.D.N.Y. May 22, 2020), *aff'd sub nom. Kirschner.*, 79 F.4th 290.  In contrast, the

17  Supreme Court concluded in *Reves* that a distribution plan was broad where a note was offered to

18  23,000 individual members of an agricultural co-op and was ultimately held by 1,600 people. 494

19  U.S. at 68.

20        Here, the FAC states that "Plaintiff was *invited* by Defendants," along with "another

21  unknown investor who supplied an unknown amount," "to be a participant in the Loan." (Doc. 13

22  at ¶ 15 (emphasis added); *see also* Doc. 34 at 13 (conceding this fact to be true).)  This fact is

23  significant for two discrete reasons.  First, "individualized solicitation" tends to weigh against a

24  finding of public offering. *Banco Espanol de Credito v. Sec. Pac. Nat. Bank*, 763 F. Supp. 36, 43

25  (S.D.N.Y. 1991), *aff'd*, 973 F.2d 51 (2d Cir. 1992).  Second, the fact that only two parties ended

26  up participating in the MPA strongly suggests that there was no plan for its widespread

27  distribution.  Nor is there any "indication that the general public was even aware of the existence

28  of th[e]" underlying Loan or the MPA.  *Banco Espanol*, 763 F. Supp. at 43.

Though the loan participation can be assigned to other individuals with no minimum investment requirement, as Plaintiff correctly points out (Doc. 34 at 13), nothing in the FAC alleges that the underlying Loan or the MPA were registered to be traded or otherwise subjected to "*common* trading for speculation or investment." *See Reves*, 494 U.S. at 66 (emphasis added). Nothing in the FAC suggests that the instant action involves "*broad-based*, unrestricted sales to the *general investing public*," "encompassing *unsophisticated investors*" who lacked "the capacity to acquire information about the debtor," *Pollack*, 27 F.3d at 813-814 (citation omitted) (emphases added). Nor has "Plaintiff . . . pled that [] trading in the secondary market broadened the distribution of the [instrument] significantly." *See Kirschner*, 2020 WL 2614765, at *9.

In sum, Plaintiff has not sufficiently alleged that either the underlying Loan or the MPA was "offered and sold to a broad segment of the public" or was otherwise subjected to "common trading for speculation or investment." *Reves*, 494 U.S. at 66, 68 (citation and quotation marks omitted). Accordingly, the second *Reves* factor weighs against a finding that either the underlying Loan or the MPA was a security.

### 3. The Third *Reves* Factor

The third *Reves* factor is "the reasonable expectations of the investing public." *Reves*, 494 U.S. at 66. Evaluating this factor, a court should "consider instruments to be 'securities' on the basis of such public expectations, even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not 'securities' as used in that transaction." *Id*. Much like the loan syndication agreement in *Kirschner*, the MPA "repeatedly refer[red] to the underlying transaction documents as 'loan documents,' and the words 'loan' and 'lender' [were] used consistently, instead of terms such as 'investor.'" *Kirschner*, 2020 WL 2614765, at *9. The MPA used the word "loan," and words like "invest" and "investment" did not appear even *once* in the Agreement, except in connection with the parties' legal names.[7]

---

[7] Plaintiff alleges, in its brief in opposition, that the MPA specifies, for instance, that Startop intends to accept investment participation from "accredited investors" only. (Doc. 34 at 13–14.) The Court, however, cannot find those statements in the FAC or in the MPA proffered by Defendants. (*See* Doc. 24-1.) Nor did Plaintiff offer *any* citation directing the Court to where it found those statements. As such, the Court is obligated to set aside those factual allegations as unsupported by the complaint; on a motion to dismiss, this Court cannot consider new facts introduced by Plaintiff in its briefs, unless (a) those facts are eligible to be incorporated by reference into the complaint, or (b) the Court can take judicial notice of them.

1    Similarly, in *Banco Espanol*, the court found the repeated use of terms like "loan" in a loan

2    participation agreement to be significant. As a result, there, as here, buyers "were given ample

3    notice that the instruments were ***participations in loans and not investments in a business***

4    ***enterprise***." *Banco Espanol*, 973 F.2d at 55 (emphasis added). Therefore, as in *Kirschner* and

5    *Banco Espanol*, this factor also weighs against a finding of security.

6        Moreover, as Defendants correctly point out, (Doc. 42 at 7), Plaintiff cites to no case in

7    which a federal court has held that participation in—or syndication of—a *single* secured loan is a

8    security. The absence of substantial judicial precedent holding that participation in a single,

9    short-term, secured loan is a security undermines Plaintiff's argument that the general public

10   reasonably believed that either the underlying Loan or the MPA was a "security." Accordingly,

11   the third *Reves* factor weighs against of a finding that either the underlying Loan or the MPA was

12   a security.

13            4.   The Fourth *Reves* Factor

14       The last *Reves* factor calls for an examination of whether there exists "some factor, such

15   as the existence of another regulatory scheme [to reduce] the risk of the instrument, thereby

16   rendering application of the Securities Act unnecessary." *Reves*, 494 U.S. at 67. "Among the

17   factors that reduce the risks associated with an instrument are whether the instrument is secured

18   by collateral . . ." *Kirschner*, 79 F.4th at 309. Here, the underlying Loan was secured by multiple

19   real properties owned by Bitwise. (Doc. 24-1 at 3.) That, "along with personal guaranties from

20   Soberal and Olguin[,]" (*Id*. at ¶ 35), reduced the risk associated with the underlying Loan,

21   *Kirschner*, 79 F.4th at 309–10.

22       Plaintiff argues that *Kirschner* is distinguishable because the Second Circuit cited policy

23   guidelines from federal banking regulators, "none of which apply here to non-banking

24   institutions." (Doc. 43 at 8 (citing *Kirschner*, 79 F.4th at 309).) The Second Circuit, however,

25   rejected a similar argument. *Kirschner*, 79 F.4th at 310 (rejecting the plaintiff's argument that

26   "'the Bank Regulators' guidance merely addresses risk management controls to ensure sound

27

28       Even if the Court were to consider that fact, "limited solicitation to sophisticated" institutions or individuals heavily
     weighs against a finding that the instrument was widely distributed to the general public. *Banco Espanol*, 763 F.
     Supp. at 43; *see also Kirschner*, 2020 WL 2614765, at *8 (similar).

1    banking practices and minimize risks to *banks*' and 'does not address risks to *investors*[]'"

2    (footnote omitted) (first emphasis in original)); *see also id*. at 310 n.116 (noting that the Second

3    Circuit rejected a similar argument in *Banco Espanol*).  The focus of the inquiry is whether the

4    general public and the financial system are adequately protected, not whether a particular plaintiff

5    or buyer is protected.[8]  *See Kirschner*, 2020 WL 2614765, at *10.

6         It is for these reasons that the Court finds the fourth *Reves* factor weigh against a finding

7    that the underlying Loan or the MPA was a "security."

8         5.      Summary and Balancing

9         In sum, all four *Reves* factors weigh slightly or heavily against a finding that the

10   underlying Loan was a security.  In addition, apart from the fact that Bitwise is medium sized

11   business, (Doc. 13 at ¶ 18), the underlying Loan here—a short-term "bridge loan" of 12 months

12   in duration, (Doc. 24-1 at 2, 9)—bears a strong resemblance to a "short-term note secured by a

13   lien on a small business or some of its assets," *Reves*, 494 U.S. at 65, one of the enumerated

14   categories of instruments that are not securities.  As such, the underlying Loan—a secured, short-

15   term commercial bridge loan—was not a security under *Reves*'s "family resemblance" test.

16        The participation agreement was not a security under the *Reves* test either.  Plaintiff "did

17   not receive an undivided interest in a pool of loans, but rather purchased participation in a

18   specific, identifiable short-term [] loan," *Banco Espanol*, 763 F. Supp. at 42, and Plaintiff has not

19   shown that "the manner in which participations in that instrument [were] used, pooled, or

20   marketed" was different than that of the underlying instrument, *see Banco Espanol*, 973 F.2d at

21   56. Consequently, acquiring half of the "stakes" in a single, privately negotiated, short-term

22   secured loan (through the Master Participation Agreement) does not mean that the Participation

23   Agreement had a character or identity meaningfully different from the underlying Loan.

24   Therefore, because "the loan participation did not have an identity separate from the underlying

25   loan[,]" and because "the underlying loan [wa]s not a security, neither [wa]s the participation"

26

27

28
_____

[8] Even though Plaintiff may have been a victim of fraud, not all fraudulent activities are actionable under federal securities law.  *Reves*, 494 U.S. at 61 ("Congress did not, however, 'intend to provide a broad federal remedy for all fraud.'" (quoting *Marine Bank v. Weaver*, 455 U.S. 551, 556 (1982))).

1  agreement. *Banco Espanol*, 763 F. Supp. at 42.[9]

2      This conclusion is confirmed by the fact that the Ninth Circuit expressly held in *First*

3  *Citizens* that a participation agreement to finance a real estate development project did not

4  constitute security under federal law, *First Citizens*, 919 F.2d at 515–16, as Defendants correctly

5  point out, (Doc. 23 at 13).  Accordingly, the Court finds that Plaintiff failed to plead facts

6  plausibly suggesting that either the underlying Loan or the MPA was a security under *Reves*.

7      **C. The *Howey-Forman* Test**

8      The remaining question is whether the MPA is an "investment contract" that qualifies as a

9  security under the *Howey-Forman* test. An "investment contract" is a term of art that "means an

10  interest that is *not a conventional security* like a bond or a share of common stock but that, having

11  the essential properties of a conventional security—being an undivided, passive (that is, not

12  managed by the investor) financial interest in a pool of assets—is treated as one for purposes of

13  [securities] laws."  *S.E.C. v. Lauer*, 52 F.3d 667, 670 (7th Cir. 1995) (Posner, C.J.) (citations

14  omitted) (emphasis added).  Thus, the term investment contract has the limited purpose of

15  identifying unconventional instruments, and the *Howey-Forman* test for assessing "investment

16  contracts" is generally not used when a case clearly involves a loan or a "note."[10]

17      In *United Housing Found., Inc. v. Forman*, the Supreme Court explained that the

18  "touchstone" of an investment contract is "the presence of an investment in a common venture

19  premised on a reasonable expectation of profits to be derived from the entrepreneurial or

20  managerial efforts of others."  421 U.S. 837, 852 (1975); *accord S.E.C. v. Edwards*, 540 U.S.

21  ──────────────────

22  [9] As discussed in more detail below, this logic holds true in the context of "investment contract" as well.  Consider, for instance, "[a] note secured by a mortgage on a single home[, which] is typically not a security because the return on investment therefrom is not derived from the entrepreneurial or managerial efforts of others[,]" but "participation interests in a managed pool of mortgage notes" may be.  *Zolfaghari v. Sheikholeslami*, 943 F.2d 451, 455 (4th Cir. 1991) (first citing *Reves*, 494 U.S. at 64–66; and then citing 12 U.S.C. § 1719(d) (1990)) (footnote omitted). "[I]nterests in amalgamated mortgage notes are securities because any profits realized are derived from the managerial efforts of those who run the pool and make such decisions as determining which mortgages shall be in the pool, how the individual notes will be serviced and managed, and other fund decisions."  *Id.*

23  [10] Tellingly, in *Banco Espanol* and *Kirschner*, after holding that loan participations and loan syndications are not securities under the *Reves* test, respectively, the Second Circuit did not proceed to consider whether the instrument at issue may be characterized as an investment contract under the *Howey* test. While people may debate about whether and when lending money to a company should be classified as a note security instead of a commercial loan, neither loan syndication nor loan participation is a contractual "investment" of money into said company's business enterprise.  *See Banco Espanol*, 973 F.2d at 55 (explaining that "*participations in loans* [are] *not investments in a business enterprise*[]" (emphases added)).

1    389, 395 (2004).

2        As Defendants correctly point out, (Doc. 42 at 6 ("This "investment versus commercial"

3    dichotomy has been recognized in numerous cases . . .")), the ultimate question with respect to

4    the "investment" element is whether Plaintiff was participating in a loan to, or making an

5    investment in, Bitwise. As the Ninth Circuit explained in *First Citizens* regarding loan

6    participations:

> In determining whether First Citizens' participation in the Agreement *was "an investment of money" or simply a risky loan*, "the ultimate question is whether the funding party contributed *risk capital* subject to the entrepreneurial or managerial efforts of others."
>
> In the Agreement, First Citizens agreed to provide a certain percentage of the development loan for an agreed rate of interest, subject to all the specified rights and obligations found in the loan documents between Worthen and the borrower. At the time the Agreement transpired, *First Citizens was simply a secured lender of a portion of a large loan* with a set interest rate that was not dependent on the managerial or entrepreneurial skills of Worthen Bank or of the borrower. First Citizens provides no evidence that at the time it entered into the Agreement it sought an investment or *thought it was making an investment in Worthen Bank* or the borrower *rather than entering into a commercial loan transaction*. Accordingly, we find that the Agreement is not an "investment contract" subject to the protections afforded by the securities laws.

17    919 F.2d at 516 (citation and footnotes omitted) (emphases added).

18        As Defendants point out, a "plaintiff, like Long Angle, was simply a secured lender of a

19    portion of a large loan." (Doc. 42 at 6 (citation and quotation marks omitted).) The FAC and the

20    MPA characterize the transaction as a "loan." (*See, e.g.*, Doc. 24-1; Doc. 13 at ¶ 15.) The MPA,

21    for instance, shows that Plaintiff was "entering into a commercial loan transaction" as "a secured

22    lender of a large loan." (Doc. 24-1 at 2–3 (stating that "the Lead and the Participants [agreed to]

23    extend a commercial bridge loan (the 'Loan') in the principal amount of $5,000,000.00" to

24    Bitwise and that the underlying Loan is secured by multiple real properties).)

25        The presence of collateral further underscores the lender's intent to secure repayment of a

26    commercial loan, not to make an investment of money into the borrower's corporate enterprise,

27    *FBS Fin., Inc. v. CleveTrust Realty Invs.*, No. C75-369, 1977 WL 1070, at *15 (N.D. Ohio Dec.

28    23, 1977) ("The substantial collateral that was available to all the participating lenders is

1    indicative of a commercial loan." (footnote omitted)), or otherwise "contribute[] *risk capital*

2    subject to the entrepreneurial or managerial efforts of others," *see Danner v. Himmelfarb*, 858

3    F.2d 515, 519 (9th Cir. 1988) (citations omitted) (emphasis added); *see also First Citizens*, 919

4    F.2d at 516 n.6 (explaining that, after *Reves*, the Ninth Circuit "still appl[ies] the 'risk capital'

5    approach to investment contracts[]"); *Reves*, 494 U.S. at 64 (noting that the Ninth Circuit's "'risk

6    capital' approach [] is virtually identical to the *Howey* test").

7          Moreover, adhering to the Supreme Court's direction that courts should consider "the

8    economic realities underlying a transaction," *Forman*, 421 U.S. 849, the Court finds that the

9    transaction here is best described as Defendants selling a portion of (i.e., a participation interest

10   in) a secured, short-term loan, rather than making an "investment of money" into the borrower's

11   business activities.  At most, Plaintiff purchased a sizable interest in a "risky loan"—a secured,

12   short-term "bridge loan" to Bitwise, a company that was already showing signs of financial

13   strain[11]—and did not make an "investment of money" into the borrower's business, per *First*

14   *Citizens*.

15         Plaintiff, however, resist the foregoing analysis based on *First Citizens*, arguing that the

16   Supreme Court's decision in *Edwards* had overruled the Ninth Circuit's opinion in *First Citizens*.

17   (*See* Doc. 34 at 8–10.)  The Court finds that argument to be without merit for the following two

18   reasons. First, in *Edwards*, the Supreme Court merely held that the *Howey-Forman* definition of

19   "profit" may include a fixed or variable rate of return, and that the word "'profits' in the *Howey*

20   test [] simply [means] 'financial returns on . . . *investments*.'"  *Edwards*, 540 U.S. at 395–96

21   (quoting *Forman*, 421 U.S., at 853) (emphasis added).  Thus, *Edwards* did not overrule *First*

22   *Citizens* in its entirety because, as Defendants correctly point out, *First Citizens* rested on a

23   distinction "between commercial loans and investments, not between fixed and variable interest

24   rates." (*See* Doc. 42 at 6–7.)[12]  In any event, even though "profits in the form of a fixed return are

25   no less profits as envisioned by the *Howey* test, [but] when considered with [other] factors already

26

27   ---

     [11] According to the FAC and the MPA, despite being backed by collateral, the interest rate represented to plaintiff for
     the underlying Loan to Bitwise was 24%—though the promissory note reflected the actual rate of 60% per annum.
28   (Doc. 13 at ¶¶ 35, 39; Doc. 24-1 at 3, 8.)  As such, a reasonably prudent sophisticated investor (e.g., another SPV) in
     Plaintiff's shoe would have had reasons to suspect that Bitwise may be under some financial strain, to say the least.
     [12] The Court notes that Plaintiff made no substantive response to this argument in its sur-reply.  (*See* Doc. 43.)

                                                        14

1    mentioned, a fixed rate of interest contributes to the impression that this was a commercial

2    undertaking rather than an investment." *See Provident Nat. Bank v. Frankford Tr. Co.*, 468 F.

3    Supp. 448, 455 (E.D. Pa. 1979).

4         Second, and relatedly, nothing in *Edwards* overruled the part of *First Citizens* that held

5    that being "a secured lender of a portion of a large [commercial] loan" does not involve any

6    "investment of money" and, therefore, does not satisfy the "investment" element of the *Howey-*

7    *Forman* test.  Because this part of *First Citizens* remains good law, (*see* Doc. 42 at 6–7 (correctly

8    noting that nothing has disturbed the "investment" requirement), the Court is obligated to find

9    that Plaintiff's participation in a secured commercial bridge loan did not meet the definition of

10   "investment contract."

11        Plaintiff also argues that *First Citizens* is "wholly inapposite" because it "involved over 20

12   savings and loan institutions and banks," whereas "Plaintiff is not a lender or financial

13   institution[.]" (Doc. 43 at 6.)  This Court, however, sees no reason to distinguish between

14   accredited financial institutions and SPVs like Plaintiff,[13] at least under the *Howey-Forman* test,

15   nor has Plaintiff cited to a case making such distinction.  Plaintiff further argues that it is "a group

16   of investors that relied upon Defendants as an investment manager[.]" (*Id*.) This assertion is not

17   supported by a citation to the FAC.[14]

18        Ultimately, the FAC and the MPA show that the loan participation agreement was not a

19   security under the *Howey-Forman* test, for Plaintiff "was [not] making an investment in [Startop]

20   or the borrower," but rather merely acted as "a secured lender of a portion of a large [commercial]

21   loan" transaction, *see First Citizens*, 919 F.2d at 516, whose terms were negotiated in private, *see*

22   *Great W. Bank & Tr. v. Kotz*, 532 F.2d 1252, 1260–62 (9th Cir. 1976) (Wright, J., concurring)

23   (explaining that an unsecured note, the terms of which were negotiated face-to-face, given to a

24   bank in return for a business loan, is not a security), *cited for support in Marine Bank*, 455 U.S. at

25   560 n.10.  Moreover, because Plaintiff merely "purchased participation in a specific, identifiable

26

27   [13] Plaintiff's full legal name is StarTop SPV – Long Angle Investments, LLC., wherein SPV means special purpose vehicle.

28   [14] Even still, the Court could not find anything in the FAC that clearly states that Plaintiff is "a group of investors." Who they are, even at a high level of generality, may be relevant to the merits of this case.

1    short-term [] loan, the loan participation did not have an identity separate from the underlying

2    loan." *Banco Espanol*, 763 F. Supp. at 42. As such, neither the underlying Loan nor the

3    subsequent Participation Agreement was a security under the *Howey-Forman* test.

4         All in all, much like *First Citizens*, this Court finds that the loan participation at issue here

5    was not a security under the *Reves* test for "notes" or the *Howey-Forman* test for "investment

6    contracts." *Id*. Accordingly, the Court **DISMISSES** Plaintiff's first cause of action **with leave to**

7    **amend**. *See Barke v. Banks*, 25 F.4th 714, 721 (9th Cir. 2022) (explaining that a district court

8    must give a plaintiff at least one chance to amend a deficient complaint unless there is a clear

9    showing that amendment would be futile).

10                   **IV.    THE SECOND TO NINTH CAUSES OF ACTION**

11        The remaining claims in this case all arise under state law. Because the Court grants leave

12   to amend the federal cause of action, it declines, at this time, to consider whether the Court should

13   exercise supplemental jurisdiction as to these remaining causes of action.

14

15                                        **CONCLUSION**

16        Based upon the foregoing, the Court **ORDERS**:

17        (1) Defendants' Motion to Dismiss (Doc. 22) is **GRANTED IN PART**.

18        (2) Plaintiff's first cause of action is **DISMISSED WITH LEAVE TO AMEND**. Any

19             amended complaint shall be filed within 30 days of the date of this order. Any

20             response thereto **SHALL** be filed within 21 days of the amendment.

21        (3) In light of this order, Defendant Bo Keuleers' Motion to Dismiss the sixth and seventh

22             state law claims (Doc. 54) is **TERMINATED.** If it is appropriate after any amended

23             complaint is filed, she may re-notice her motion or file it anew.

24

25   IT IS SO ORDERED.

26   Dated:   __**October 22, 2025**__                    _Jennifer L. Thurston_

27                                                           UNITED STATES DISTRICT JUDGE

28